**In re Leland Lavont BRADY, Jr., a/k/a Lee Lavont Brady and Joann Ruth Brady, Debtors.**

Bankruptcy No. 4–88–241.

United States Bankruptcy Court, D. Minnesota.

May 5, 1988.

Thomas J. Lallier, Minneapolis, Minn., for CFS Mortg. Corp.

Craig Cook, St. Paul, Minn., for debtor.

J.J. Mickelson, Minneapolis, Minn., Trustee pro se.

## ORDER OVERRULING OBJECTIONS TO CONFIRMATION

ROBERT J. KRESSEL, Chief Judge.

This case came on for hearing on the objection of CFS Mortgage Corporation to confirmation of the debtors' plan. Thomas J. Lallier appeared for CFS; Craig Cook appeared for the debtors; and J.J. Mickelson, the trustee, appeared pro se. This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 103(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). Based on the evidence, memoranda of counsel, and the file of this case, I make the following Memorandum Order.

### BACKGROUND

The debtors own a home that they value in their schedules at $45,000.00. CFS is the holder of the first mortgage on the debtors' home with a balance due as of January 22, 1988, of $22,427.36, including a delinquency of $2,887.62. Under the terms of the mortgage, interest accrues at the rate of $5.38 per day.

Associates Industrial Loan Company is the holder of a second mortgage on the debtors' homestead, with an approximate balance due as of January 22, 1988, of $19,512.76, including a delinquency of $2,233.35. Associates had begun foreclosure proceedings on the debtors' homestead and a sheriff's foreclosure sale was scheduled for March 21, 1988.

The debtors filed a case under chapter 13 on January 22, 1988. At the same time,

they filed their plan. Among the provisions of the debtors' plan are the following:

2. *Classes* Each secured claim is designated a separate class, shall be determined under 11 U.S.C. § 506 and shall be paid the amount allowed as of the effective date of the plan or the payments due if such payments are maintained as provided below, and each holder thereof shall retain the lien securing such claim until the claim is paid....

3. *Payments* Debtor, or the trustee if so provided below, shall cure defaults within a reasonable time and the debtor shall maintain the payments due while the case is pending on any claim secured solely by a security interest in a mobile home or real property.... Debtor or an entity from whom debtor receives income shall hereafter pay to the trustee for payments to creditors the sum of $470.00 each month hereafter, commencing Feb. 22, 1988, until all claims are paid the amounts payable under the plan....

.　　.　　.　　.　　.

5. *Additional Provisions* (if any): ... The $1,740.06[1] & $2,233.35 home mortgage dleinquencies (sic) to CFS Mortgage Corp. & Assoc. Industrial Loan Co. respectively, will be paid through the Plan by the Trustee within a reasonable time. Debtors shall resume regular mortgage payments in February 1988.

The meeting of creditors was held on February 24, 1988. On February 26, 1988, CFS filed objections to confirmation of the debtors' plan. CFS had four objections to confirmation: (1) The amount of CFS's delinquency that the plan proposed to pay was incorrect; (2) the plan did not provide for a payment of interest on the prepetition delinquency; (3) the debtors' plan did not provide for paying CFS's attorney's fees in connection with the case; and (4) under the plan, CFS's defaults would not be cured within a reasonable time.

A hearing on confirmation of the debtors' plan was scheduled for March 17, 1988, but continued to April 21, 1988. Because

the debtors agreed to pay the correct amount of CFS's delinquency, CFS withdrew its first objection. It also withdrew its fourth objection. While it did not formally withdraw its third objection, CFS did not press it at the confirmation hearing. Thus, confirmation of the debtors' plan revolves around one issue: must the debtors' plan provide for paying CFS interest on its prepetition delinquencies?

## DISCUSSION

This issue is much discussed in the cases and is the gordian knot of chapter 13, incapable of being untied. Since the knot may not be untied, it is the challenge of the bankruptcy judge to cut it. Sometimes a gordian knot can be cut with one hard, swift blow. Other times, however, the knot can only be cut by hacking away at it from both sides until finally the last few remaining strands unravel of their own accord. I am afraid this is one of the latter times.

The discussion of this problem typically revolves around three provisions of chapter 13, although only two are really relevant. The first two provisions are found in § 1322. Section 1322 is entitled "Contents of plan." Subsection (a) specifies those provisions which the plan must provide and subsection (b) lists some of the provisions which a chapter 13 plan may contain. Lastly, § 1322(c) contains one provision that the plan may not contain. We are dealing here with the second type: provisions which are neither required nor prohibited, but which are permitted. Specifically §§ 1322(b)(2) and 1322(b)(5), provide:

(b) Subject to subsections (a) and (c) of this section, the plan may—

.　　.　　.　　.　　.

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the

---

1. The debtors now agree that this number is incorrect and agree to pay the correct delinquency of $2,887.62.

rights of holders of any class of claims;

.    .    .    .    .

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

11 U.S.C. § 1322(b)(2) and (5).

Section 1322(b)(2) contains a general rule that chapter 13 plans may modify the rights of secured creditors, with the single exception that the plan may not modify the rights of creditors who are secured only by the debtor's principal residence. It is apparent that CFS falls within the ambit of the exception and if § 1322(b) went no further, this problem would not arise. However, § 1322(b)(5) purports to contain an exception to subsection (b)(2). It does not really provide an exception to the general rule in § 1322(b)(2) since subsection (b)(5) is really an example of one way that the rights of secured creditors can be modified. To the extent that it is an exception, it is an exception to the exception found in § 1322(b)(2). In other words, the only way that the rights of creditors secured solely by the debtor's principal residence can be modified is in the method provided in subsection (b)(5).[2]

The thrust of CFS's argument is that § 1322(b)(5) is a bit of whimsical humor on the part of Congress. CFS argues that although the debtors' plan may contain a provision providing for curing defaults within a reasonable time and maintaining payments while the case is pending, the plan may nevertheless not be confirmed.

The punch line to Congress' joke, according to CFS, is found in § 1325(a)(5) which provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

.    .    .    .    .

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(c) the debtor surrenders the property securing such claim to such holder.

11 U.S.C. § 1325(a)(5). Since CFS has not accepted the plan and the debtors are not surrendering the property securing its claim, the plan must comply with § 1325(a)(5)(B). It is conceded that the plan provides for CFS to retain its lien, but CFS argues that § 1325(a)(5)(B)(ii) is not met since the plan does not provide that it receive the value, as of the effective date of the plan,[3] of its allowed secured claim.

CFS's allowed secured claim would be determined in accordance with § 506(a) and (b) which provide:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim

**2.** However, for our purposes, we really need not concern ourself with subsection (b)(2). The debtor is trying to take advantage of subsection (b)(5) and the fact that CFS is secured only by the debtors' principal residence is irrelevant.

**3.** While interest and attorney's fees would accrue until confirmation, Local Rule 134(a) provides that "the term 'effective date of the plan' in the plan and chapter 13 of the Code is deemed the date the petition was filed." In a case which

I will discuss later, Judge O'Brien tantalized us with the possibility that Local Rule 134(a) was unconstitutional. In Judge O'Brien's case and this case, no one has raised the problem of what the effective date of the plan should be. Therefore, Judge O'Brien did not discuss it in his case and I do not intend to discuss it in this one. (Declaring statutes and rules unconstitutional is a popular sport in this district lately.)

to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506 (a) and (b). As of the date the case was filed, CFS's secured claim would be its entire debt of $22,427.36, which includes the delinquencies which in turn include an element of unpaid interest and perhaps some attorney's fees as well.

In order to receive the present value of its allowed secured claim, CFS must receive interest. As to the future payments which the debtors are making according to the mortgage, CFS is receiving interest. However, on the delinquencies which the debtors propose to pay over a reasonable time, CFS does not receive interest and therefore, to that limited extent, CFS is not receiving the value of its allowed secured claim as § 1325(a)(5)(B)(ii) seems to require.

Under § 1322(b)(5) however, CFS's secured claim is irrelevant. The debtors need only cure defaults within a reasonable time and maintain the regular payments and they are home free or at least home more cheaply than under § 1325(a)(5).

One thing is worth noting at this juncture. Section 1325(a)(5) does not really require that creditors receive the value of their secured claim in order for the plan to be confirmed. Section 1325 provides that the court shall confirm the plan if the six listed criteria are met. § 1325(a) contains sufficient conditions for confirmation of a chapter 13 plan, but not necessary conditions for confirmation of a chapter 13 plan.[4] Thus, as written, § 1325(a) does not contain requirements for confirmation.

I am not sure that this problem can be solved by interpreting literally all the relevant provisions and either trying to reconcile them or concluding that they are irreconcilable and picking one over the other. Rather I think the problem is much more susceptible to a holistic than a surgical solution. While it is always risky trying to determine congressional intent, it is even more perilous in the Bankruptcy Code, since there is virtually no legislative history to speak of and that which does exist tends to be unenlightening. The committee reports and comments that do exist on §§ 1322 and 1325 do nothing more than reiterate the language of the two sections themselves. However, taking a reasonable approach to § 1325(a)(5) leads me to believe that Congress could not have intended it to apply in this situation. Section 1325(a)(5) requires that a secured creditor receive the present value of its entire allowed secured claim, not just that portion which consists of arrearages. In order to receive present value on its current payments, CFS would be entitled to a current market rate of interest on its entire secured claim, not simply what the contract provides. That may or may not be the same as the contract. It may be higher and it may be lower. Clearly, Congress did not intend that current market rate interest be paid on secured claims that are being paid under § 1322(a)(5).

Rather it is fairly clear to me that in enacting § 1322(b)(5), Congress wanted to allow chapter 13 debtors to keep intact the current payment provisions of a secured

---

**4.** In another bit of congressional humor, this is the exact opposite of the situation in chapter 11 cases. Section 1129(a) dealing with confirmation of a chapter 11 plan provides that the court shall confirm a plan *only if* all of the listed requirements are met. Thus, § 1129 contains necessary conditions for confirmation of a chapter 11 plan, rather than sufficient conditions. I am sure that CFS appreciates the irony.

debt, while curing the defaults in a reasonable time. A debtor who makes use of § 1322(b)(5) need do no more and no less.

I think that rather than Congress playing a joke on debtors in § 1322(b)(5), that the joke is really on secured creditors. I think that Congress thought that a debtor who was utilizing § 1322(a)(5) was not really modifying a secured claim. If this is a joke on secured creditors, it is at least one that they should be use to. Analogous provisions are found in chapter 11. Section 1123(b) deals with permissive provisions of a chapter 11 plan, one of which is that the plan may "impair or leave unimpaired any class of claims." A claim is considered unimpaired in chapter 11, if the plan:

[N]otwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(2). If not necessarily humorous, I am sure most secured creditors find this an odd description of being "unimpaired."

Section 1322(b)(5) is the chapter 13 analogue to nonimpairment. It is very similar to the definition of nonimpairment found in § 1124(2) with the notable exception that the chapter 11 provision seems to require that any cure be done immediately on confirmation, while in chapter 13 the cure can be done within a reasonable time. This is simply a recognition of the difference in chapter 13 cases and chapter 11 cases. Chapter 13 debtors are typically consumers or small business proprietors who are not in a position to refinance their debts or obtain new funding which would enable them to cure defaults on confirmation of a plan. Therefore, Congress has allowed them to cure those defaults within a reasonable time.[5]

I think the chapter 11 comparison can be carried even farther. In dealing with a secured claim in a chapter 11 case, the debtor must:

(1) obtain the creditor's acceptance, § 1129(a)(8)(A);

(2) leave the creditor "unimpaired," § 1129(a)(8)(B); or

(3) "cram down" the plan on the creditor, § 1129(b)(2)(A).

Essentially, the same options are available to a chapter 13 debtor. The debtor must:

(1) obtain the creditor's acceptance, § 1325(a)(5)(A);

(2) cure defaults within a reasonable time and maintain payments during the case, § 1322(b)(5); or

(3) "cram down" the plan on the creditor, § 1325(a)(5)(B).

To summarize, I conclude that § 1325(a)(5) applies to those situations where a plan truly modifies a secured claim under § 1322(b)(2). However, when the debtor chooses to utilize § 1322(b)(5) and cure defaults within a reasonable time and maintain payments while the case is pending, then the debtors are not really modify-

---

**5.** Those courts which allow cures in chapter 13 cases over lengthy periods of time, up to and including five years, do violence to this provision and congressional intent. It was Congress' feeling that although a cure would be extended some period of time, that should not be lengthy time so that the financial impact on secured creditors, although existent, is minimal. Thus, in Minnesota it is unusual for plans to provide

ing the rights of secured creditors and § 1325(a)(5) is not applicable.[6]

I realize that there are numerous cases on this issue deciding it at least two different ways. I have read most of those cases and I cannot really say that reading them advanced my inquiry into this problem one iota.[7] I am also aware that there are three circuit court opinions on this issue. *In re Capps*, 836 F.2d 773 (3rd Cir.1987) and *Foster Mortgage Corp. v. Terry (In re Terry)*, 780 F.2d 894 (11th Cir.1986) reached the same result that I have. *Cardinal Federal Savings & Loan Assoc. v. Colegrove*, 771 F.2d 119 (6th Cir.1985), reached, with one dissent, a contrary result. Suffice it to say that I find the two cases that agree with me more persuasive.

Lastly, and of more concern to me, is the contrary result recently reached by Judge O'Brien, *In re Catlin*, 81 B.R. 522 (Bktcy. D.Minn.1987). In fact CFS, in its brief, did little more than rely on Judge O'Brien's opinion. Certainly this difference of opinion between Judge O'Brien and me is regrettable, but it is not unique and it is unavoidable in any court that has more than one judge. For those that argue that I should agree with Judge O'Brien for the sake of consistency, I can only point out that Judge O'Brien started it. I decided this issue the same way in 1983. *See In re Canter*, No. 3–83–42, slip op. (Bktcy.D. Minn. Apr. 28, 1983). Frankly, I feel that it is Judge O'Brien who, in the interest of consistency, should have agreed with me rather than vice versa. To those chapter 13 attorneys who are pulling their hair out over this disagreement between Judge O'Brien and me, I can only point out that "variety is the spice of life."

THEREFORE, IT IS ORDERED: The objections of CFS Mortgage Corporation to the debtors' plan filed January 22, 1988 are overruled.

for cure of defaults in any period of time that significantly exceeds twelve months.

6. I am sure that secured creditors reactions to this analysis is the same as that of Euripides in *Medea* when he said "khrusos de kreisson murion logon brotois."

7. It is my impression that bankruptcy judges publish entirely too many opinions. The results of this plethora of published opinions are at least three. First, judges are made lazy, substituting case citations for original thinking. Second, attorneys are given false hope since they can always find a "case on it." Third, the legal publishers have more grist for their printing mills.